1  Daniel Low (Bar #218387)
   **KOTCHEN & LOW LLP**
2  1745 Kalorama Road NW, Suite 101
   Washington, DC 20009
3  Telephone: (202) 471-1995
   Fax: (202) 280-1128
4  Email: dlow@kotchen.com

5  *Attorney for Plaintiff Sulzberg & Putative Class*

#### UNITED STATES DISTRICT COURT
#### NORTHERN DISTRICT OF CALIFORNIA
#### SAN JOSE DIVISION

| | |
|---|---|
| TAMI SULZBERG, | |
| Plaintiff, | Case No.: 5:19-cv-5618 |
| v. | **COMPLAINT** |
| HAPPIEST MINDS TECHNOLOGIES, | FOR EMPLOYMENT DISCRIMINATION |
| Defendant. | CLASS ACTION |
| | DEMAND FOR JURY TRIAL |

Plaintiff Tami Sulzberg brings this action on behalf of herself and a class of similarly situated individuals to remedy pervasive, ongoing race and national origin discrimination by Defendant Happiest Minds Technologies ("Happiest Minds"), and alleges as follows:

### **NATURE OF THE ACTION**

1. Happiest Minds is an Indian company that provides information technology and consulting services. Happiest Minds employs approximately 2,400 employees worldwide, the majority of whom are located in India. While only about 12% of the United States' IT industry (the industry in which Happiest Minds operates) is South Asian, at least 90% (or more) of Happiest Minds'

United States workforce is South Asian (primarily from India).[1] As discussed below, this grossly disproportionate workforce results from Happiest Minds' intentional pattern or practice of employment discrimination against individuals who are not South Asian (and who are not of Indian national origin), including discrimination in job placement (*i.e.*, hiring/staffing) and termination decisions, and its use of employment practices that result in a disparate impact on those same groups.

2. Happiest Minds' employment practices violate the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("Section 1981"), and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Plaintiff seeks, on her own behalf, and on behalf of a class of similarly situated individuals, declaratory, injunctive, and other equitable relief, compensatory and punitive damages, including pre- and post-judgment interest, attorneys' fees, and costs to redress Happiest Minds' pervasive pattern or practice of discrimination.

**PARTIES**

3. Plaintiff Tami Sulzberg was born in the United States, and is of American national origin and Caucasian race. She is a resident of San Jose, California. Plaintiff is a member of a protected class, as recognized by Section 1981 and Title VII. Plaintiff has exhausted her administrative remedies and has complied with the statutory prerequisites of filing a Title VII complaint by filing a charge against Happiest Minds with the U.S. Equal Employment Opportunity Commission, and receiving a notice of right to sue.

4. Defendant Happiest Minds is an Indian corporation that provides digital transformation, infrastructure, security, and product engineering services. Happiest Minds is headquartered in Bangalore, India. It employs over 2,400 individuals worldwide and approximately 200 individuals in the U.S. Happiest Minds is registered with and authorized to do business in California maintains an

---

[1] As used herein, "South Asian" refers to individuals who trace their ancestry to the Indian sub-continent. *See, e.g., Fonseca v. Sysco Food Serv. of Az., Inc.*, 374 F.3d 840, 850 (9th Cir. 2004) ("Under 42 U.S.C. § 1981, discrimination based on ancestry or ethnic characteristics is prohibited" as discrimination based on race) (citation omitted). "Indian" refers to individuals born in India, or whose ancestors came from India. *See, e.g., Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*, 154 F.3d 1117, 1119 (9th Cir. 1998) (holding that "national origin" refers to both a person's place of birth, and the country from which his or her ancestors came).

office (its U.S. headquarters) and place of business in this District at 2051 Junction Avenue, San Jose, California 95131.

## JURISDICTION

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 2000e-5(f), *et seq.*, and 42 U.S.C. § 1981(a).

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), as the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between a citizen of a state and a foreign corporation.

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d), as this matter is a class action with an amount in controversy of greater than $5 million, exclusive of interest and costs, and involves at least one class member who is a citizen of a state and is brought against a foreign corporation.

8. This Court has personal jurisdiction over Happiest Minds because it engages in continuous and systematic business contacts within the State of California and maintains a substantial physical presence in this State, including the operation of its office and U.S. headquarters in San Jose, California. Additionally, Plaintiff's claims arise, in part, out of Happiest Minds' activities in California.

## VENUE AND INTRADISTRICT ASSIGNMENT

9. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)-(c) and 42 U.S.C. § 2000e-5(f)(3) because Happiest Minds resides in this District, conducts business within this District, and engaged in discriminatory conduct in this District. Assignment to this Division is proper pursuant to Civil L.R. 3-2(c) because a substantial part of the events giving rise to this matter occurred in this Division. For example, and as discussed further below, Ms. Sulzberg was employed by Happiest Minds in San Jose, California and was subject to the company's discriminatory policy or practice in this Division. Additionally, Happiest Minds engages in continuous and systematic business contacts within this District, and maintains a substantial physical presence in this District, including the operation of its U.S. headquarters in San Jose, California.

## STATEMENT OF FACTS

*Overview of Happiest Minds' Business Model*

10. Happiest Minds has six offices in the United States and employs approximately 2,400 employees worldwide. Happiest Minds made over $42.4 million in revenue in fiscal year 2017, and derives approximately 70% of its revenue from the United States (its largest market).

11. Happiest Minds contracts with U.S. companies to provide IT-related services. These contracts are secured by Happiest Minds' salespersons, such as Plaintiff, who are employed by Happiest Minds to generate new business and sales for the company. Once Happiest Minds secures a contract with a client, it hires individuals to fill positions to service the client. Both external applicants and existing employees are considered for these positions.

*Overview of Happiest Minds' Discriminatory Scheme*

12. Happiest Minds prefers to hire and employ South Asians and Indians, and it effectuates this preference in three ways. First, Happiest Minds engages in a practice of securing H-1B visas (and other visas) for South Asian and Indian workers located overseas who will then be used to staff U.S. positions. The federal government annually awards 65,000 H-1B visas (plus an additional 20,000 for individuals with advanced degrees). These visas are awarded on a lottery basis. Given the cap on H-1B visas, companies compete to secure visas for prospective visa workers. Each year, companies submit H-1B visa petitions at the beginning of April for visas to be awarded later that year. H-1B visa petitions must identify an actual job at a specific location that the prospective visa worker will fill if awarded a visa.

13. To fulfill its employment preference for South Asians and Indians, Happiest Minds seeks to maximize the number of visas it receives each year from the federal government. Happiest Minds submits visa petitions for more positions than actually exist in the U.S. in order to maximize its chances of securing the highest number of available H-1B visas from the lottery process. In this way, Happiest Minds has been able to secure visas for far more individuals than it actually has a present need for. For example, from 2013 to 2018, Happiest Minds received 188 new H-1B visas (or visa amendments) and 12 new L-1 visas (or visa amendments) in 2018 alone – far more positions than

could actually exist given that Happiest Minds has hired only about 55 employees in the U.S. from 2014 forward and employs only approximately 200 employees in the U.S.

14. All, or substantially all, of the individuals for whom Happiest Minds secures visas are South Asian and Indian. While both individuals already located in the U.S. and foreign individuals who are visa-ready are considered for open positions in the U.S., Happiest Minds' South Asian and Indian visa-ready individuals are given preference for these positions. Similarly, non-South Asian and non-Indian individuals are often displaced from their current positions in favor of South Asian and Indian visa-ready individuals. For instance, and as discussed in further detail below, Ms. Sulzberg was replaced in her Director of Business Development position (a sales role) by an L-1 visa holder, Chandan Das, who traveled from India to the U.S. for work.

15. Second, Happiest Minds gives preference to South Asian and Indian applicants located in the U.S. over non-South Asian and non-Indian applicants. Happiest Minds has an internal recruiting department responsible for locating talent within the U.S. These efforts are supplemented by third-party recruiting companies. On information and belief, both Happiest Minds' internal recruiters and its third-party recruiters give preference to locating and recruiting South Asian and Indian candidates, who are then given preference throughout the hiring process. As a result, Happiest Minds hires a disproportionately high percentage of South Asians and Indians within the United States that far exceeds the proportion of those individuals in the relevant labor market. For example, from January 2014 through October 2018, Happiest Minds hired 52 individuals in the U.S., 29 of whom (56%) are South Asian and 26 (50%) of whom are visa-dependent. Further, on information and belief, Happiest Minds has at least three new South Asian salespersons since November 2018. These figures are striking, given that only about 12% of the United States' IT industry (the industry in which Happiest Minds operates) and only 1-2% of the U.S. population as a whole is South Asian.

16. Third, because of its discriminatory preference for South Asians and Indians, Happiest Minds terminates non-South Asians and non-Indians at disproportionately high rates, compared to South Asians and Indians. Non-South Asians and non-Indians assigned to projects and those working in sales roles are terminated at substantially higher rates than South Asian and Indians. For instance,

while Happiest Minds hired just 23 non-South Asians from January 2014 through October 2018, Plaintiff is aware of four non-South Asian and non-Indian salespersons (in addition to herself) who were involuntarily terminated by Happiest Minds during this same period. On information and belief, this practice of terminating non-South Asians and non-Indians is uniformly applied across all job groups in the U.S. by Happiest Minds.

17. Further, Happiest Minds' employment practices also have a disparate impact on non-South Asian and non-Indian applicants and employees. First, Happiest Minds' practice of relying on visa workers to staff U.S. positions results in available positions overwhelmingly going to South Asian and Indian individuals, to the exclusion of non-South Asian and non-Indian candidates. Second, Happiest Minds' practice of applying for large numbers of work visas results in available positions overwhelmingly going to South Asian and Indian individuals, to the exclusion of non-South Asian and non-Indian candidates. Third, Happiest Minds' employee allocation practices result in available positions overwhelmingly going to South Asian and Indian individuals, to the exclusion of non-South Asian and non-Indian candidates. Fourth, Happiest Minds' hiring decision-making process, as a whole, results in available positions overwhelmingly going to South Asian and Indian individuals, to the exclusion of non-South Asian and non-Indian candidates.

18. Happiest Minds' U.S. workforce reflects the result of its discriminatory scheme. While only about 12% of the U.S. IT industry and only 1-2% of the U.S. population as a whole is South Asian, approximately 90% (or more) of Happiest Minds' United States-based workforce is South Asian and Indian, as is the vast majority of its managerial and supervisory-level staff.

*Plaintiff's Experiences*

19. Ms. Sulzberg is an experienced and highly skilled sales professional with considerable academic and work experience. Ms. Sulzberg holds a Bachelor of Science in Engineering from the University of Florida and a Master of Business Administration from the University of North Carolina at Chapel Hill. She has over 25 years of professional experience in Director and Vice President roles.

20. Ms. Sulzberg has been employed in the sales and business development field for decades and specializes in high tech products and services. As a result of her training and experience, Ms. Sulzberg

18
COMPLAINT
CASE NO. 5:19-CV-5618

has a wide array of skills that include expertise negotiating and closing complex, multi-million dollar sales deals, C-level consultative selling skills and experience, and a proven track record of achieving and exceeding financial targets and objectives.

21. Ms. Sulzberg began working for Happiest Minds on January 17, 2018 as a Director of Business Development (a sales role) and was responsible for winning new business for the company. Ms. Sulzberg reported to Salil Godika, Chief Executive Officer ("CEO") of Happiest Minds' Product Engineering Services division, who is South Asian, and Ashutosh Shukla, Senior Vice President and Head of Operations for Happiest Minds, who is also South Asian. To her knowledge, Ms. Sulzberg was the only female salesperson in the United States, and the only salesperson (of approximately 25 individuals) who was non-South Asian and non-Indian. Every member of Happiest Minds' leadership team, including its Executive Chairman, Executive Board, and Officers are also South Asian.

22. The weekend of March 3-4, 2018, Ms. Sulzberg was invited to attend a sales meeting in Houston, Texas with members of Happiest Minds' leadership team. Ms. Sulzberg was the only female employee at the meeting and the only individual who was non-South Asian and non-Indian. At the meeting, Ms. Sulzberg's colleagues created a hostile work environment for her. For instance, Ms. Sulzberg was excluded by her South Asian colleagues who spoke in Hindi, thereby precluding her from participating in certain conversations, and was specifically asked not to attend the first portion of the meeting involving the whole group. Ms. Sulzberg was given no explanation as to why she was told not to attend the first portion of the sales meeting and why she, the only non-Indian in attendance, was the only person Happiest Minds attempted to exclude. Further, when Ms. Sulzberg gave her presentation at the sales meeting, the CEO of Happiest Minds, Salil Godika, was rude to Ms. Sulzberg, and repeatedly interrupted her, stating that he didn't want to look at her PowerPoint and telling her to "move on, move on." While Ms. Sulzberg was allotted one hour for her presentation, Mr. Godika cut her off after just ten minutes. Mr. Godika also asked Ms. Sulzberg to book him a hotel room for a future meeting with Gap Inc., despite the fact that Ms. Sulzberg's sales role did not involve such administrative or secretarial responsibilities.

23. In April 2018, Ms. Sulzberg registered for an Oracle NetSuite annual customer event in Las

Vegas. The event was scheduled to take place the week of April 23, and is attended by thousands of NetSuite's end customers. Ms. Sulzberg had previously attended a NetSuite / Oracle event in Palo Alto just prior to the conference, and was actively working on obtaining new business from NetSuite. Ms. Sulzberg's request to attend the event was approved by Ashutosh Shukla, Senior Vice President and Head of Operations for Happiest Minds. On April 16, 2018, Ms. Sulzberg participated in a weekly telephone call with Mr. Godika, CEO of Happiest Minds. During this call, Ms. Sulzberg informed Mr. Godika that she planned to attend the Oracle event in Las Vegas the following week and that she had already set meetings with some of the Oracle partners in attendance. However, following this call, Ms. Sulzberg was informed by Mr. Shukla that Mr. Godika did not want her to attend the event, despite the fact that she had been told at the time of her hire that Happiest Minds would allow her to attend low cost events such as the Oracle annual customer event. While Ms. Sulzberg was prohibited from attending the event, which would have allowed her to meet a number of potential clients and to have generated meetings and sales for Happiest Minds, Happiest Minds allowed Eswar Kappeta to attend the Oracle event. Mr. Kappeta is South Asian and Indian.

24. Ms. Sulzberg was a competent and qualified worker throughout her short tenure with Happiest Minds and performed well in her role as a Director of Business Development. However, on or around February 20, 2018, Happiest Minds informed Ms. Sulzberg that she needed to obtain at least ten meetings within the next thirty days, and thus would be evaluated based on her meetings generated with clients and potential clients, rather than her revenue. The meetings metric is an inside sales measurement, more typically used to appraise junior salespersons, not someone of Ms. Sulzberg's level of experience. In fact, none of Happiest Minds' senior salespersons (all of whom are South Asian) are evaluated based on their number of meetings generated.

25. While Happiest Minds hired an inside salesperson, Srinivasan JT, to generate meetings for Ms. Sulzberg on March 12, 2018 (approximately three weeks after setting the thirty-day deadline for Ms. Sulzberg to generate ten meetings), this individual went on paternity leave shortly after he was hired, and did not begin setting meetings for Ms. Sulzberg until the end of April, just weeks prior to her May 10, 2017 termination. Despite this lack of assistance, Ms. Sulzberg personally generated ten

meetings with potential customers and partners by March 20, 2018, and was not terminated by Happiest Minds at that time.

26. However, on May 9, 2018, Ms. Sulzberg was told that her quantity of meetings was "below par" and that she was now required to generate two to three meetings per week. Happiest Minds then terminated Ms. Sulzberg's employment the following day, after less than four months with the company. While Ms. Sulzberg was informed by the CEO of Happiest Minds, Mr. Godika, that she was terminated for "not having enough meetings," this excuse was pretextual, as Ms. Sulzberg had many meetings with large companies during her short tenure with the company, and Happiest Minds' refusal to allow Ms. Sulzberg to attend the Oracle NetSuite annual customer event precluded her from generating additional meetings.

27. Ms. Sulzberg's termination was discriminatory, and was the result of Happiest Minds' pattern or practice of discriminating against non-South Asian and non-Indian employees. On information and belief, other non-South Asian salespersons, including Randall Nufer, Robert Smith, Michael Havens, and Lee Williams, were also terminated by Happiest Minds. Mr. Nufer, for instance, was terminated after approximately nine months of employment and replaced by a visa-holding South Asian named Sreejit Menon, who traveled from India to assume Mr. Nufer's role. While Ms. Sulzberg was terminated after just sixteen weeks of employment, Happiest Minds has retained less qualified South Asian salespersons, including, for example, Ketan Patel. Mr. Patel has worked Happiest Minds for over one year and on information and belief, did not sell any new business for the company during his first year of employment with Happiest Minds and continues not to meet his sales goals. While Mr. Patel was given an existing book of business valued between $400,000 and $500,000 when he was hired by Happiest Minds in May 2017, thereby allowing him to generate some ongoing or recurring revenue from current clients, Ms. Sulzberg was not afforded the same benefit.

28. Following her termination, Ms. Sulzberg was replaced by Chandan Das, a South Asian and Indian salesperson who works in the United States pursuant to an L-1 visa (Happiest Minds also employs additional salespersons in the United States on a L-1 visas, including, for example, Chetan Peshdande, Rohit Basa, Ravi Shankar, and Sreejit Menon). Unlike Ms. Sulzberg, Mr. Das has no

prior sales experience in the United States, and has only "tele-sales experience." However, Happiest Minds does not generate sales over the phone, so this experience is irrelevant.

## CLASS ACTION ALLEGATIONS

29. Plaintiff brings this Class Action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4), seeking injunctive, declaratory, equitable, and monetary relief for Happiest Minds' systematic pattern or practice of discriminatory employment practices based upon individuals' race and national origin. This action is brought on behalf of the following class:

> All individuals who are not of South Asian race and Indian national origin who applied for positions with (or within) Happiest Minds in the U.S. and were not hired and/or who Happiest Minds involuntarily terminated.

30. Members of the class are so numerous and geographically dispersed across the United States that joinder is impracticable. While the exact number of class members is unknown to Plaintiff, this number, upon information and belief, exceeds forty. Furthermore, the class is readily identifiable from information and records in Happiest Minds' possession.

31. There are numerous questions of law and fact common to the class. Among the common questions of law or fact are: (a) whether Happiest Minds has engaged in a pattern or practice of discrimination against non-South Asian and non-Indian individuals in its hiring, staffing, and termination/retention decisions; (b) whether Happiest Minds' employment practices have resulted in a disparate impact against non-South Asian and non-Indian individuals; (c) whether Happiest Minds has violated Section 1981; (d) whether Happiest Minds has violated Title VII; (e) whether equitable and injunctive relief is warranted for the class; and (f) whether compensatory and/or punitive damages are warranted for the class.

32. Plaintiff's claims are typical of the class. All members of the class were damaged by the same discriminatory policies and practices employed by Happiest Minds, *i.e.*, they were denied the opportunity to fairly compete for and obtain employment with Happiest Minds, were denied positions within the company, and/or were terminated by the company.

33. Plaintiff will fairly and adequately protect the interest of other class members because she has no interest that is antagonistic to or which conflicts with those of any other class member, and

Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in class action employment discrimination litigation to represent her and the class.

34. Because of Happiest Minds' actions, which were taken intentionally and/or with reckless disregard for the federally protected rights of Plaintiff and the class, Plaintiff and the class have suffered substantial harm for which punitive damages is warranted.

35. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Happiest Minds has acted and/or refused to act on grounds generally applicable to the class, making declaratory and injunctive relief appropriate with respect to Plaintiff and the class. Members of the class are entitled to declaratory and injunctive relief to end Happiest Minds' discriminatory policies and practices.

36. Class certification is appropriate pursuant to Rule 23(b)(3) for determination of the damage claims of individual class members because the issue of whether Happiest Minds engages in a pattern or practice of discrimination and/or its corporate practices result in a disparate impact against non-South Asian and non-Indian individuals is common and predominates over individual issues of proof. Class certification under Rule 23(b)(3) would be superior to other methods for fair and efficient resolution of the issues because, among other reasons, certification will avoid the need for repeated litigation by each individual class member. The instant case will be manageable as a class action. Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

37. In the alternative, class certification is appropriate pursuant to Rule 23(c)(4) to litigate Plaintiff's claims for prospective classwide compliance and affirmative injunctive relief necessary to eliminate Happiest Minds' discrimination. Certification under this rule is also appropriate to decide whether Happiest Minds has adopted a systemic pattern or practice of racial and national origin discrimination and/or has engaged in practices that have resulted in a disparate impact against non-South Asian and non-Indian individuals. Certification under this rule is also appropriate to determine classwide damages, including punitive damages.

## COUNT I
### (Disparate Treatment on the Basis of Race)
### (Violation of Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981)

38. Plaintiff re-alleges each preceding paragraph as though fully set forth herein.

39. Throughout the class liability period, Happiest Minds has engaged in a pattern or practice of discriminating against individuals who are not of South Asian race by: (a) knowingly and intentionally favoring South Asian individuals in employment decisions, including hiring, staffing, and termination decisions; (b) knowingly and intentionally disfavoring non-South Asian individuals (including Plaintiff) in employment decisions, including hiring, staffing, and termination decisions; and (c) knowingly and intentionally creating and maintaining an overwhelmingly disproportionate workforce in the United States consisting of at least 90% (or more) South Asian employees.

40. As a direct and proximate result of Happiest Minds' intentional discrimination, Plaintiff and members of the class have been denied employment, denied the fair opportunity to obtain employment, and denied fair opportunities with regard to staffing and/or continued employment with Happiest Minds.

41. Happiest Minds' actions constitute unlawful discrimination on the basis of race in violation of 42 U.S.C. § 1981.

## COUNT II
### (Disparate Treatment on the Basis of Race and National Origin)
### (Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

42. Plaintiff re-alleges each preceding paragraph as though fully set forth herein.

43. Throughout the class liability period, Happiest Minds has engaged in a pattern or practice of discriminating against individuals who are not of South Asian race or Indian national origin by: (a) knowingly and intentionally favoring individuals of South Asian race and Indian national origin in employment decisions, including hiring, staffing, and termination decisions; (b) knowingly and intentionally disfavoring individuals who are not of South Asian race and Indian national origin (including Plaintiff) in employment decisions, including hiring, staffing, and termination decisions; and (c) knowingly and intentionally creating and maintaining an overwhelmingly disproportionate workforce in the United States consisting of at least 90% (or more) South Asian employees (primarily

from India).

44. As a direct and proximate result of Happiest Minds' intentional discrimination, Plaintiff and members of the class have been denied employment, denied the fair opportunity to obtain employment, and denied fair opportunities with regard to staffing and/or continued employment with Happiest Minds.

45. Happiest Minds' actions constitute unlawful discrimination on the basis of race and national origin in violation of 42 U.S.C. § 2000e, *et seq.*

## COUNT III
### (Disparate Impact on the Basis of Race and National Origin)
### (Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

46. Plaintiff re-alleges each preceding paragraph as though fully set forth herein.

47. Throughout the class liability period, Happiest Minds has used policies and practices related to hiring, staffing, and terminations described herein that has resulted in available positions overwhelming going to South Asian and Indian individuals, and that has resulted in the disproportionate termination of non-South Asian and non-Indian individuals, *e.g.*, (1) Happiest Minds' reliance upon South Asian visa holders (primarily from India) to staff U.S. positions; (2) Happiest Minds' practice of applying for a large number of work visas for South Asian individuals; (3) Happiest Minds' internal employee allocation practices; and (4) Happiest Minds' hiring decision-making process, as a whole, results in available positions overwhelmingly going to South Asian and Indian individuals, to the exclusion of non-South Asian and non-Indian candidates. These practices have had a disparate impact on the basis of race and national origin (harming those who are not of South Asian race or Indian national origin) that are neither job-related for the positions at issue nor consistent with business necessity.

48. Happiest Minds' actions constitute unlawful discrimination in violation of 42 U.S.C. § 2000e, *et seq*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the class pray for relief as follows:

a. Certification of the case as a class action pursuant to Federal Rule of Civil Procedure 23;

b. Designation of Plaintiff as representative of the class;

c. Designation of Plaintiff's counsel as counsel for the class;

d. A declaratory judgment that the practices complained of herein are unlawful and violate Section 1981;

e. A declaratory judgment that the practices complained of herein are unlawful and violate Title VII;

f. A permanent injunction against Happiest Minds and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in unlawful policies, practices, customs, and usages set forth herein;

g. An Order requiring Happiest Minds to adopt a valid, non-discriminatory method for hiring, staffing, termination, and other employment decisions;

h. An Order requiring Happiest Minds not to retaliate against individuals who complain of racial or national origin discrimination;

i. An Order requiring Happiest Minds to post notices concerning its duty to refrain from discriminating against employees on the basis of race and national origin, or retaliating against those who complain of racial or national origin discrimination;

j. Award Plaintiff and the class damages – including (without limitation) punitive damages and compensatory damages – for the harm they suffered as a result of Happiest Minds' violations of Section 1981 and Title VII;

k. Award Plaintiff and the class pre- and post-judgment interest at the prevailing rate on damages as a result of Happiest Minds' discrimination against them in violation of Section 1981 and Title VII;

l. Award Plaintiff and the class front- and back-pay, reinstatement, and such other equitable relief as the Court deems just and appropriate;

m. Award reasonable attorneys' fees, expert witness fees, expenses, and costs of this action and of prior administrative actions; and

n. Award Plaintiff and the class such other relief as this Court deems just and appropriate.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff and the class respectfully demand a trial by jury on all issues properly triable by a jury in this action.

DATED: September 6, 2019

Respectfully submitted,

By: /s/Daniel Low

Daniel Low, SBN 218387
**KOTCHEN & LOW LLP**
1745 Kalorama Road NW, Suite 101
Washington, DC 20009
Telephone: (202) 471-1995
Email: dlow@kotchen.com;

*Attorney for Plaintiff Sulzberg & Putative Class*